[Cite as *State v. Jackson*, 2013-Ohio-4846.]

# IN THE COURT OF APPEALS

# ELEVENTH APPELLATE DISTRICT

# LAKE COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| | | **CASE NO. 2012-L-061** |
| - vs - | : | |
| ROBERT L. JACKSON, JR., | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Lake County Court of Common Pleas, Case No. 11 CR 000162.

Judgment: Affirmed.

*Charles E. Coulson*, Lake County Prosecutor, and *Karen A. Sheppert*, Assistant Prosecutor, 105 Main Street, P.O. Box 490, Painesville, OH 44077 (For Plaintiff-Appellee).

*Aaron T. Baker*, 38109 Euclid Avenue, Willoughby, OH 44094 (For Defendant-Appellant).

THOMAS R. WRIGHT, J.

{¶1}   This appeal is from the final judgment in a criminal action before the Lake County Court of Common Pleas.  Following a jury trial, appellant, Robert L. Jackson, Jr., was found guilty on multiple charges of aggravated burglary, aggravated robbery, and kidnapping, and a single charge of grand theft.  In seeking reversal of the conviction, he primarily contends that he was denied a fair trial because the trial court did not properly instruct the jury as to the manner in which it should consider the testimony of an alleged

co-conspirator.

{¶2} The criminal charges against appellant were based upon a home invasion of a residence located on Gebhart Place in the City of Willowick, Ohio. At that time, January 11, 2011, the residence was owned by Kathy Snyder, who lived there with her five children, Michael Snyder, Daniel Snyder, Kelsea Snyder, Jonathon Prochaska, and Joseph Prochaska. Of those five children, only Jonathon and Joseph were below the age of eighteen.

{¶3} The invasion took place at some point after 7:00 a.m. At that time, Kathy Snyder was not present having already left for work. Similarly, Michael Snyder was not present because he had spent the night elsewhere. Daniel Snyder was asleep in a bedroom in the basement. Kelsea Snyder and her boyfriend, Mark Castillo, were asleep in a separate bedroom on the main floor. Jonathon and Joseph, who were both in the eighth grade and would have been at school if not for an illness, were sleeping in a bedroom they shared on the main floor.

{¶4} Notwithstanding the fact that Daniel's bedroom was in the basement, he kept a safe in a hallway closet near the bedrooms on the main floor. During the period of time immediately prior to the home invasion, Daniel kept a significant amount of cash in the safe.

{¶5} Approximately one year before the home invasion, Daniel was introduced to Tyrese Johnson by a mutual high school friend. Although Daniel and Johnson only saw each other a few times during the interim period, Johnson was aware that Daniel kept a large amount of cash at his mother's home.

{¶6} On the date of the incident, Johnson was living with his girlfriend and son

2

in an apartment in Mentor, Ohio. Early that morning, Johnson told appellant about the cash in the Snyder residence and the means by which it could be stolen from Daniel. Johnson also allowed appellant to borrow his girlfriend's vehicle to drive to the Snyder home in Willowick. However, Johnson himself did not participate in the home invasion.

{¶7} After taking Johnson's girlfriend to work that morning, appellant and two other men drove to Willowick and parked the vehicle on a roadway directly behind the Snyder home. All three men were dressed in dark clothing, including dark sweatshirts with hoods to hide their faces. Upon going through the backyard of an adjacent home, the three men went to the front door of the Snyder residence and knocked.

{¶8} Even though the Snyder family dog began to bark, Jonathon was the only person in the home who immediately woke up. When he answered the door, one of the three men asked if he could make a telephone call. While Jonathon went back to his bedroom to retrieve his cell phone, the three men came into the home and went into the living room. After using Jonathon's cell phone, the first man then asked if he could use a bathroom. In response, Jonathon directed him to the hallway bathroom that was near the three "main floor" bedrooms.

{¶9} When the first intruder exited the bathroom, he did not return to the living room, but went into Jonathon's and Joseph's bedroom. Appellant, one of the two intruders still in the living room, forced Jonathon to go back into that bedroom. Upon entering the bedroom, Jonathon saw that the first intruder was pointing a gun at Joseph's head. The first intruder and appellant then asked both boys where the "money" was. The boys responded by handing over their remaining "Christmas" money, totaling only $170. In addition, the first intruder and appellant took the boys' respective

cell phones and video game systems, which they placed in the boys' school backpacks.

{¶10} Unsatisfied with the boys' response concerning where the "money" was, appellant went into Kelsea's bedroom and began to look into her closet. When he first entered her bedroom, Kelsea was not there, having been awaken by the dog's barking and needing to use the bathroom. Unaware of the presence of any intruders, Kelsea was startled when she re-entered the room and saw appellant, who immediately turned toward her and demanded to know where the "money" was. In doing this, he pulled a black revolver from behind his back and pointed it directly at Kelsea, who said that she did not have any money.

{¶11} At that juncture, appellant noticed the presence of Mark Castillo, who was still asleep in Kelsea's bed. Appellant then walked over to the bed and punched Mark in the chest. When Mark quickly woke up, appellant pointed the revolver at him and again asked where the "money" was. In response, Mark located a five-dollar bill in a dresser draw and gave it to appellant, who immediately left the room.

{¶12} Mark and Kelsea proceeded to shut the bedroom door and lock it, hoping to locate a cell phone and call 9-1-1. However, within seconds, appellant was yelling for Kelsea to re-open the door and making threats regarding Jonathon and Joseph. Before Mark could unlock the door, it was kicked in, and appellant re-entered the room along with the first intruder. When appellant again pointed the revolver at Mark, a momentary scuffle ensued, with Mark attempting to gain control of the gun. Mark gave up the struggle when the first intruder made threats toward Kelsea.

{¶13} Prior to going into Kelsea's bedroom with appellant, the first intruder had learned of the location of Daniel's safe in the hallway closet. After the struggle for

4

appellant's revolver was over, Kelsea and Mark were ordered to go into hallway where Kelsea was then ordered to lay on the floor near Jonathon and Joseph. Mark was ordered to go to the basement to get Daniel so that the safe could be opened.

{¶14} Appellant accompanied Mark to the basement. As Mark was attempting to explain the situation to Daniel, appellant again pointed his gun at both of them. Not wanting his brothers and sisters to be harmed, Daniel came up from the basement and opened the safe. Upon ordering Daniel and Mark to also lie on the floor of the hallway, the first intruder removed all of the cash from the safe. When they were then preparing to leave the residence, the first intruder and appellant ordered the five to stay on the floor and not move until they had counted to one hundred. As they were going to the front door, the three intruders took a third video game system that was "hooked up" to a television in the living room.

{¶15} Within moments after the intruders left, Daniel got up and locked the front door. He then retrieved his cell phone from the basement and called the police. Although Daniel thought that he recognized two of the intruders, he initially was unable to provide any names to the police. However, three days after the incident, Daniel was able to identify appellant and the first intruder in separate photo lineups.

{¶16} When appellant and the two other intruders first parked their vehicle on the neighborhood street and were walking toward the Snyder residence, they had been seen by a resident of an adjacent road who was taking a morning walk. Since the three men were all dressed in dark clothing with hoods and their vehicle was the sole vehicle parked on the street, the resident thought the situation was suspicious; accordingly, he wrote down the vehicle's license plate number. Later that morning, when the resident

5

saw the police at the Snyder residence, he gave the plate information to an officer and told him what he had witnessed.

{¶17} After the home invasion was completed, appellant eventually drove back to Mentor and returned the vehicle to Tyrese Johnson. At that time, he gave Johnson a share of the money taken from Daniel Snyder's safe. Later that same day, Johnson and his girlfriend were traveling in the vehicle when they were stopped by a local policeman. As the officer was first approaching the vehicle, Johnson placed the money he received from appellant in his girlfriend's purse. As part of the subsequent search of the vehicle, the money was found in the purse, and Johnson ultimately admitted his role in planning the home invasion.

{¶18} While the ensuing criminal action against appellant was pending, Johnson entered a plea agreement with the state, under which he pleaded guilty to conspiracy to commit a robbery and receiving stolen property. For his sentence, Johnson was placed on probation. As part of the plea bargain, Johnson agreed to testify against appellant.

{¶19} Approximately three months after the incident, appellant was indicted on two counts of aggravated burglary, five counts of aggravated robbery, five counts of kidnapping, and one count of grand theft. Except for the grand theft charge, each count against him was a first-degree felony. In addition, each of the thirteen counts contained a three-year firearm specification alleging that appellant had possession of a firearm during the commission of the offense.

{¶20} A three-day jury trial was conducted in March 2012. In testifying on behalf of the state, Kelsea Snyder, Daniel Snyder, and Mark Castillo each identified appellant as the intruder who pointed a black revolver to her/him at various times during the

home invasion. Tyrese Johnson also testified about the conversation he had with appellant about the presence of the money in the Snyder residence. After appellant testified on his own behalf, the jury returned a guilty verdict on all thirteen counts and all accompanying firearm specifications.

{¶21} The trial court sentenced appellant to an aggregate term of fifteen years on the thirteen offenses, and one consecutive term of three years on the specifications. In appealing, appellant raises three assignments of error for review:

{¶22} "[1.] The trial court engaged in plain error when it violated R.C. 2923.03(D) by not instructing the jury regarding the testimony of alleged accomplice of Tyrese Johnson.

{¶23} "[2.] As a result of trial counsel's failure to urge the trial court to instruct the jury regarding the testimony of alleged accomplice Tyrese Johnson, pursuant to R.C. 2923.03(D), the defendant-appellant was denied the effective assistance of counsel at trial, in violation of his Sixth Amendment rights.

{¶24} "[3.] The state did not provide the evidentiary basis necessary to require additional incarceration under the firearm specification statute."

{¶25} Under his first assignment, appellant maintains that he was denied a fair trial because the trial court failed to properly instruct the jury on its role in determining the credibility of the testimony of Tyrese Johnson. He submits that, since Johnson was guilty of conspiring in the commission of the home invasion, the trial court was required to include in its jury instructions a specific "credibility" statement delineated under R.C. 2923.03(D).

{¶26} R.C. 2923.03 governs the criminal offense of complicity. Division (A)(3) of

7

the statute provides that a person can be found guilty of complicity if he conspires with another individual to commit a crime. Division (D) of the statute then states:

{¶27} "(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

{¶28} "'The testimony of the accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of the witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.'

{¶29} "'It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"

{¶30} In considering the possible prejudicial effect of a trial court's failure to give the foregoing instruction to the jury, this court has indicated:

{¶31} "The legislative purpose of R.C. 2923.03(D) is to alert juries of the potentially self-serving motivation behind an accomplice's testimony. *State v. Williams* (1996), 117 Ohio App.3d 488, 495. * * *. '(* * *) Despite the mandatory nature of R.C. 2923.03(D), the statute only requires substantial, not strict, compliance.' *State v. Woodson*, 10th Dist. No. 03AP-736, 2004 Ohio 5713, at ¶17. 'Applying this law, Ohio courts generally look to three factors to determine whether a trial court's failure to give the accomplice instruction constitutes plain error: (1) whether the accomplice's testimony was corroborated by other evidence introduced at trial; (2) whether the jury

8

was aware from the accomplice's testimony that he benefitted from agreeing to testify against the defendant; and/or (3) whether the jury was instructed generally regarding its duty to evaluate the credibility of the witnesses and its province to determine what testimony is worthy of belief.' Id. at ¶18." *State v. Bentley*, 11th Dist. Portage No. 2004-P-0053 2005-Ohio-4648, ¶58. The Tenth Appellate District concluded that the lack of the accomplice instruction will not adversely affect the outcome of the trial when the first factor and one of the two remaining factors are present. *Woodson*, at ¶18.

**{¶32}** In this case, a review of the trial court's jury instructions demonstrates that no specific instruction was ever given as to the credibility of Tyrese Johnson which was similar in wording to the instruction set forth in R.C. 2923.03(D). However, the record further shows that appellant's trial counsel never requested the trial court to give an instruction consistent with the statute. Thus, the plain error *Bentley* standard applies.

**{¶33}** As to the first Bentley factor, the state was presented other evidence corroborating Johnson's testimony regarding the nature of the conversation he had with appellant on the morning of the incident. For example, there was evidence showing that Johnson's girlfriend confirmed with the police that appellant did borrow her vehicle that morning after dropping her off at work. Moreover, a local resident testified that he saw the girlfriend's vehicle in the vicinity of the Snyder residence about the time the invasion of the home occurred. Finally, there was considerable testimony showing that appellant entered the Snyder home for the specific purpose of stealing Daniel's stash of cash.

**{¶34}** Concerning the second factor, as part of his direct examination, Johnson testified as to the specific nature of the plea agreement he reached with the state, and that the only reason he was in jail at that time was because he had subsequently

9

violated his probation. He also admitted to the jury that, as a term of the bargain, he had agreed to testify against appellant. Thus, the jury was fully aware of how appellant benefitted by cooperating with the state in its case against appellant.

{¶35} Finally, as to the third factor, the record confirms that the trial court gave a proper instruction to the jury concerning its role as the ultimate evaluator of a witness's credibility. Specifically, the trial court informed the jury that it was the sole "judge" on any issue of credibility. Furthermore, the jury was instructed that only it could decide what testimony was worthy of belief.

{¶36} Viewed as a whole, there is no dispute that, despite the fact that the jury was not given the instruction required, it still was informed that it had the ability to reject Tyrese Johnson's testimony if it found that he was not a credible witness. Therefore, since each factor of the *Bentley* standard is satisfied in this instance, the trial court's failure to give the statutory instruction was not plain error. Appellant's first assignment lacks merit.

{¶37} Under his next assignment, appellant contends that, in light of the fact that his trial attorney failed to request an instruction under R.C. 2923.03(D), he was denied his constitutional right to effective assistance of counsel. Generally, a conviction can be reversed on the basis of ineffective assistance only if: "(1) the performance of defense counsel was seriously flawed and deficient; and (2) the result of appellant's trial would have been different if defense counsel had provided proper representation." *State v. Kovacic*, 11th Dist. Lake No. 2010-L-065, 2012-Ohio-219, ¶45. Since both prongs of this test must be met before a finding of ineffective assistance can be made, it is unnecessary to determine whether counsel's actions were below an objective standard

10

of reasonable representation when the record demonstrates a lack of sufficient prejudice. *Id.*

{¶38} Given our conclusion under the first assignment that lack of an instruction under R.C. 2923.03(D) did not constitute plain error, it follows that the second prong for a showing of ineffective assistance cannot be met under the facts of this case. That is, even if the failure to request the instruction rendered trial counsel's performance deficient, that error did not adversely affect the outcome of the trial. Stated differently, appellant was not materially prejudiced by the lack of the prototype instructions. Thus, his second assignment is also without merit.

{¶39} Under his final assignment, appellant contests the legal sufficiency of the state's evidence in regard to the thirteen firearm specifications. He argues that the state failed to present any evidence showing that the revolver he possessed during the entire invasion of the Snyder residence was operable.

{¶40} The black revolver which, according to three eyewitnesses, appellant wielded was not recovered. Therefore, the state was unable to perform any scientific tests to determine whether the firearm was capable of shooting a bullet. Moreover, nothing occurred during the incident which could be deemed direct evidence of operability; i.e., there was no evidence that appellant fired the revolver. As a result, the state's case on operability was circumstantial.

{¶41} Each of the thirteen firearm specifications against appellant were brought under R.C. 2941.145. Division (A) of this statute provides that a three-year mandatory prison term can be imposed if the indictment asserts that "the offender had a firearm on or about the offender's person or under the offender's control while committing the

11

offense and displayed the firearm, brandished the firearm, indicated that the offender possessed the firearm, or used it to facilitate the offense."

**{¶42}** In turn, R.C. 2923.11(B)(1) defines the term "firearm" as a "deadly weapon capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant. 'Firearm' includes an unloaded firearm, and any firearm that is inoperable but that can readily be rendered operable."

**{¶43}** In relation to the evidence sufficient to establish that a firearm was operable when the underlying offense was committed, R.C. 2923.11(B)(2) states that "[w]hen determining whether a firearm is capable of expelling or propelling one or more projectiles by the action of an explosive or combustible propellant, the trier of fact may rely upon circumstantial evidence, including, but not limited to, the representations and actions of the individual exercising control over the firearm."

**{¶44}** In contending that the state's evidence was insufficient to satisfy the basic definition of "firearm," appellant relies solely upon decision of the Supreme Court of Ohio in *State v. Gaines*, 46 Ohio St.3d 65 (1989). In *Gaines*, it was held that, in the absence of any testimony concerning gunshots, smell of gunpowder, bullets, or bullets holes, the appearance of the gun and the witnesses' subjective belief regarding operability was not sufficient for the state to carry its burden of proof. *Id.* at 69.

**{¶45}** However, in subsequent decisions, the Supreme Court has expanded the evidence upon which a finding of operability can be based. For example, in *State v. Thompkins*, 78 Ohio St.3d 380 (1997), the offender entered a convenient store and pointed a gun directly at the clerk. The offender then stated to the clerk that this was a "holdup" and to act as quickly as possible. In holding that the conviction on the firearm

12

specification should have been upheld, the *Thompkins* court stated:

{¶46} "In determining whether an individual was in possession of a firearm and whether the firearm was operable or capable of being readily rendered operable at the time of the offense, the trier of fact may consider all relevant facts and circumstances surrounding the crime, which include any implicit threat made by the individual in control of the firearm." *Id.* at 385.

{¶47} In this case, the evidence was sufficient to establish that appellant made specific threats, both explicit and implicit, while he was brandishing a revolver in front of two of the hostages. First, Kelsea Snyder testified that when appellant initially became aware of her presence in her bedroom, he pointed the revolver directly toward her while asking where the "money" was. More importantly, she also testified that when appellant was momentarily locked outside her bedroom, he threaten to shoot her little brothers if she and Mark Castillo did not immediately let him back in the room. Additionally, Mark testified that when appellant first woke him up, appellant pointed the revolver directly at his forehead while asking where the "money" was.

{¶48} Viewed as a whole, the testimony of Kelsea and Mark constituted circumstantial evidence upon which a reasonable juror could find that, unless someone told appellant where the disputed money was located, he intended to shoot one of them or Kelsea's little brothers. Based upon this, the jury could infer that appellant's revolver was operable at the time; i.e., the gun was capable of expelling or propelling a projectile by the action of an explosive or combustible propellant. Accordingly, the state presented sufficient evidence. Appellant's third assignment is not well-taken.

{¶49} Since all three assignments of error lack merit, it is the judgment and order

13

of this court that the judgment of the Lake County Court of Common Pleas is affirmed.


CYNTHIA WESTCOTT RICE, J., concurs,

COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.


_____


COLLEEN MARY O'TOOLE, J., dissents with a Dissenting Opinion.

{¶50} I respectfully dissent.

{¶51} Appellant's first assignment of error is dispositive. Appellant asserts that the trial court failed to properly instruct the jury by omitting the accomplice testimony instruction under R.C. 2923.03(D). Based on the record in this case, I agree.

{¶52} Because appellant's counsel failed to request the instruction or object to the court's failure to give the instruction, we review his claim for plain error. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e. affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). Courts are to notice plain error under Crim.R. 52(B), "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.* (citation omitted).

{¶53} In *State v. Adams*, 62 Ohio St.2d 151 (1980), the Ohio Supreme Court held that the failure to separately and specifically instruct the jury on every essential element of each crime with which an accused is charged does not per se constitute

14

plain error, but that under such circumstances plain error review requires the examination of the record in each individual case. *Id.* at paragraphs two and three of syllabus.

{¶54} After reviewing the record in this case, this writer believes the trial court's failure to give the mandatory accomplice testimony instruction was plain error. As the majority points out, R.C. 2923.03(D) provides:

{¶55} "(D) If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

{¶56} "'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

{¶57} "It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"

{¶58} When the state presented Tyrese Johnson's testimony, it presented the testimony of an alleged co-conspirator of appellant. Johnson testified that he helped appellant plan all of the crimes with which he was charged. Johnson explained that he showed him where Daniel Snyder lived, told him he would find money there, and provided him with the vehicle with which the crime could be completed. Johnson further testified that, in exchange, he received a portion of the proceeds from the crimes.

15

{¶59} Based on the foregoing, I believe appellant was prejudiced and prevented from having a fair trial, due to the trial court's omission of the R.C. 2923.03(D) mandatory instruction. Accordingly, I would reverse the judgment of the trial court and remand the matter for a new trial.

{¶60} Thus, I dissent.